IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| VERICEPT CORPORATION<br>a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SIRVA, INC.<br>a Delaware Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. _____

JUDGE GETTLEMAN

MAGISTRATE JUDGE NOLAN

## COMPLAINT

In this Complaint, plaintiff Vericept Corporation ("Vericept") seeks compensation for defendant Sirva, Inc.'s ("Sirva") knowing and willful breach of a written contract as well as Sirva's unjust enrichment resulting from its improper exploitation of Vericept's proprietary Internet security system.

### PARTIES, JURISDICTION, AND VENUE

1.  Vericept is a corporation organized and existing under the laws of Delaware with its principal place of business located at 750 West Hampden Ave., Suite 550, Englewood, CO 80110-2163. Vericept enables companies to manage financial, compliance, reputation and productivity risk by analyzing all inbound and outbound Internet traffic for any activity falling outside of a company's internal information controls and acceptable use. Vericept immediately identifies Internet use that places a company at risk, activity such as the unauthorized release of private customer information, the leaking of confidential business plans, the premature posting of company earnings reports, employees and contractors viewing pornographic images, or employees using the company network to plan violent acts and network attacks.

2. On information and belief, Sirva is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 700 Oakmont Lane, Westmont, IL 60559. Sirva is a large relocation and moving company that owns the famous brands Allied, North American, Pickfords and others. Sirva operates in over forty countries and has to manage a workforce of over 7,800 employees.

3. The parties are citizens of different states, and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs. Accordingly, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

4. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1).

## FACTUAL ALLEGATIONS

5. Vericept makes computer software for its customers that, when installed on the customer's hardware, continuously monitors Internet activity and collects data regarding employee Internet use that is relevant to the areas selected by the customer. With the assistance of Vericept's proprietary technology, a customer like Sirva may reduce Internet misuse and abuse, ensure compliance with federal and state regulations, including Sarbanes Oxley and HIPAA, and protect its intellectual property.

6. In exchange for a licensing fee, Vericept's customers receive Vericept software corresponding to the number of employees of the customer, which is designed to fit the customer's needs, training, and implementation.

### Sirva Contracted with Vericept to Test the System

7. On October 4, 2004, Vericept Regional Sales Manager Michael M. Twitty met Chuck Shmayel, Sirva's Vice President of Infrastructure & Security, at a conference in Chicago. During their meeting, Shmayel informed Vericept that Sirva was in the process of evaluating Internet content monitoring solutions and that Sirva was interested in learning more about

Vericept's Internet monitoring system.

   8.  Vericept sent sales representatives to Sirva's corporate headquarters in Westmont, Illinois in November 2004 to make a sales presentation. During this meeting, Sirva expressed a desire to observe and evaluate Vericept's technology in action. Vericept and Sirva agreed that Vericept would install a Vericept system at a Sirva facility located in Minneapolis, Minnesota on a trial basis on December 6, 2004 in order to monitor and analyze Sirva's inbound and outbound Internet activity free of charge. The free trial period is known as an Exposure Assessment. As part of an Exposure Assessment, Vericept produces a report, known as an Exposure Assessment Report, for select employees of the customer who are designated to review the information provided by the Vericept software. The Exposure Assessment Report may include general information concerning the number of incidences of a particular activity as well as isolate the unique activities of a specific Internet user.

   9.  Vericept and Sirva executed Vericept's standard Exposure Assessment Agreement on November 30, 2004 prior to installation of the evaluation system (the "Vericept Agreement"). The Vericept Agreement governs the terms under which Sirva received access to Vericept's technology during the trial evaluation period. A true and correct copy of the Vericept Agreement is attached hereto as Exhibit A.

   10.  Pursuant to the Vericept Agreement, Sirva received a short-term evaluation license to Vericept's security system at no charge. Since Sirva was evaluating the Vericept system free of charge, Sirva agreed to a number of restrictions regarding the disclosure and use of the information it learned about or received from the Vericept system. In particular, Sirva agreed that:

> The Exposure Assessment is intended to provide overall visibility into Customer's network activity. It is not intended to be used as a

vehicle to take action against specific individuals. Consequently, *if any action is taken against individuals, Customer will license the Software at then current list price.*

*See* Ex. A at p. 1 (emphasis added).

### **Vericept's Assessment Report of Sirva**

11. On December 9, 2004, Vericept provided Sirva the first assessment report with data derived from the evaluation system installed at Sirva's Minneapolis facility (the "Vericept Report"). In accordance with the contract that restricted Sirva from taking action against specific individuals, Vericept redacted from the Vericept Report identifying information that could be used to link the subject matter with specific individuals. *See* Ex. A, p.1.

12. During the December 9, 2004 meeting, Vericept also discussed with Sirva specific pricing information for the hardware and software Sirva was contemplating purchasing from Vericept. A true and correct copy of the list pricing information is attached hereto as Exhibit B. The list price for Vericept's monitoring service was approximately six hundred and fifty thousand dollars, or approximately $85 per Sirva employee. *See* Ex. B.

13. The Vericept Report covered a variety of topics, ranging from the number of times Sirva employees had sent out social security numbers to the number of times Sirva's employees had entered certain Internet chat rooms.

14. Sirva expressed strong interest in the portion of the report dealing with potentially inappropriate "adult" activity. In particular, Sirva focused on a particular incident in which a Sirva employee (dubbed "Employee X") utilized the Internet to enter "adult" chat rooms.

15. Sirva requested that Vericept provide it with the identity of Employee X. Vericept declined Sirva's request and reminded the Sirva representative that the Vericept Agreement prohibited Sirva from taking action against a specific individual on the basis of

information obtained from the Vericept unit during the evaluation period.

16. Following the meeting, Vericept changed the password to the Vericept evaluation unit so that Sirva's employees would not circumvent the prohibitions in the Vericept Agreement and attempt to recreate the information redacted in the Vericept Report to learn the identity of Employee X.

## Sirva's Breach of the Vericept Agreement and Use of Vericept Data

17. On December 14, 2004, Sirva renewed its demand for the identity of Employee X. However, Sirva never entered into a license agreement with Vericept and never even offered to compensate Vericept for the particular information on Employee X.

18. Unbeknownst to Vericept at the time, on or about December 10, 2004, one of Sirva's senior network engineers, Richard Burton, intentionally switched off the Vericept unit's monitoring capabilities and sent out a memo to Sirva's employees reminding them of Sirva's policy governing the use of Sirva's computers.

19. After discovering Burton's actions, upon information and belief, Chuck Shmayel, Sirva's Vice President of Infrastructure & Security, informed Burton in a December 13, 2004 e-mail that the only remaining way for Sirva to obtain the identity of Employee X was to compensate Vericept. Shmayel copied Sirva executives Ann Harten, Sirva's Chief Information Officer, and Paul DiSalvo.

20. After Vericept again declined Sirva's request for the identity of Employee X, upon information and belief, on December 14, 2004 Sirva tasked its employees with utilizing the information from the Vericept Report, as well as any other information that they could glean from the Vericept evaluation unit, to identify Employee X.

21. On December 16, 2004, Sirva's period to evaluate the Vericept unit ended.

22. On December 17, 2004, Sirva informed Vericept that it had chosen to license the software of one of Vericept's competitors. Sirva did not disclose its on-going attempts to locate Employee X.

23. Between December 20, 2004 and January 5, 2005, upon information and belief, Sirva was able to utilize the information in the Vericept Report, as well as other information obtained from the Vericept unit during the evaluation period, to identify and terminate Employee X.

## First Cause of Action
(Breach of Contract)

24. Vericept incorporates by reference as if fully stated herein each and every allegation contained in paragraphs 1 through 23.

25. The Vericept Agreement is a valid contract that binds both Vericept and Sirva.

26. Vericept fully performed all of its duties and obligations under the terms of the Vericept Agreement.

27. Under the terms of the Vericept Agreement, Sirva was prohibited from using information obtained from the Vericept Report to take action against its employees.

28. Sirva breached the Vericept Agreement by, among other things, utilizing the information in the Vericept Report to identify and terminate one of its employees that it deemed to be improperly using Sirva's property.

29. At the time Sirva acted on the information it learned from the Vericept Report to identify and terminate Employee X, the current list price for the Vericept unit, including software, was $659,231.00. *See* Ex. B.

30. Pursuant to the terms of the Vericept Agreement, Sirva owes Vericept $659,231.00 plus interest accrued at the statutory rate.

31. A of the date of this Complaint, despite repeated demands, Sirva has not paid Vericept the monies it owes.

## SECOND CAUSE OF ACTION
(Unjust Enrichment)

32. Vericept incorporates by reference as if fully stated herein each and every allegation contained in paragraphs 1 through 31.

**33.** In violation of a valid and binding agreement, Sirva improperly utilized and exploited information it obtained from Vericept.

**34.** Sirva improperly induced Vericept to install and implement a costly Internet security system and gained immense value from the system without any compensation to Vericept.

35. Sirva obtained a benefit at Vericept's expense by exploiting Vericept's hardware and software to obtain information that allowed it, among other things, to terminate an employee that Sirva deemed to be misusing Sirva's computer systems to view adult content websites.

36. Prior to obtaining the information from Vericept's hardware and software, Sirva was unaware of the activities of the employee that prompted Sirva to terminate the employee.

37. In violation of a valid and binding agreement, Sirva refuses to compensate Vericept for the benefit it has received and retained.

38. It would be unjust under the circumstances for Sirva to benefit from the use of the information provided by Vericept without compensating Vericept.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Vericept Corporation respectfully requests that judgment be entered in its favor and prays:

a) That this Court order Sirva to pay Vericept actual damages in the amount of $659,231.00 plus interest at the applicable statutory rate up to and through the date any judgment against Sirva is satisfied; and

b) That this Court award Vericept compensation for the benefits unjustly received and retained by Sirva at Vericept's expense; and

c) That this Court award Vericept its attorneys' fees and costs incurred in this action; and

d) That this Court award Vericept such other further relief as this Court shall deem just.

Dated: February 14, 2005

By: *[signature]*
James A. Rolfes
Sachnoff & Weaver, Ltd.
10 South Wacker Drive, Suite 4000
Chicago, IL 60606-7507
Tel: (312) 207-1000
Fax: (312) 207-6400

Attorneys for Plaintiff
VERICEPT CORPORATION

**Of Counsel**
COOLEY GODWARD LLP
Amy Hartman
Chad T. Nitta
380 Interlocken Crescent
9th Floor
Broomfield, CO 80021
Telephone: (720) 566-4000

# EXHIBIT A

11/30/2004 11:38 FAX 002/004

## EXPOSURE ASSESSMENT AGREEMENT

This Exposure Assessment Agreement (the "Agreement") sets forth the terms and conditions under which **Vericept Corporation**, a Delaware corporation with address at 750 West Hampden Avenue, Suite 550, Englewood, CO 80110-2163 ("Licensor") will provide to: **North American Van Lines, Inc. / allied Sirva**, a corporation, with its principal place of business at 700 Oakmont Lane, Westmont, IL 60559 ("Customer") an evaluation copy of Licensor's software product(s) listed on the attached Exhibit A ("Software"). The purposes of the Agreement are for evaluation and testing by Customer as well as to provide visibility into activity being conducted on Customer's network ("Exposure Assessment"). Licensor and Customer agree that the specific conditions pertaining to this Exposure Assessment are as follows:

**Grant of License:** Licensor grants to Customer, during the Term of this Agreement as specified in Section 2 below, a no fee and royalty-free, nontransferable nonexclusive right to use and configure the Software for the Exposure Assessment. This right is subject to the following additional specific agreements and covenants by Customer concerning the use of the Software:

(i) the Software is for Customer's own internal use only and that it shall not sell or transfer any copies of the Software, shall not re-license, rent or lease the Software, or use the Software for commercial time-sharing or service bureau use;

(ii) Customer shall make no copies of the Software except as reasonably necessary to accomplish the Exposure Assessment;

(iii) Customer shall not modify or cause or permit the disassembly, reverse compilation, or reverse engineering of the Software, except as otherwise specified by law;

(iv) Customer hereby acknowledges that Customer does not acquire any rights in the Software, express or implied, other than those specified in this Agreement.

(v) The terms and conditions of the Mutual Non-Disclosure Agreement attached hereto as Exhibit B shall apply.

**Term:** The term of this agreement shall be 10 days ("Term"). The Term will begin on the entry of the license code. Upon completion of the Term, the Software and Hardware must be immediately returned to Licensor.

**Technical Support:** Licensor will provide Customer with documentation and technical support necessary to install and administer the Software.

**Limited Warranties:** THE SOFTWARE IS PROVIDED 'AS IS" WITH NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF TITLE, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR USE.

**Limitation of Liability:** NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOSS OF ANTICIPATED PROFITS OR BENEFITS, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NEITHER PARTY'S LIABILITY FOR DAMAGES RELATING IN ANY WAY TO THIS AGREEMENT OR THE CONDUCT OF THE PARTIES IN FURTHERANCE HEREOF UNDER ANY LEGAL THEORY, WHETHER CONTRACT, TORT, PRODUCT LIABILITY, BREACH OF IMPLIED DUTY OR OTHERWISE SHALL EXCEED THE FEES PAID UNDER THIS AGREEMENT.

**Governing Law:** This Agreement shall be governed by the laws of the State of Delaware, U.S.A.

**Export Administration:** Customer shall comply fully with all relevant export laws and regulations of the United States ("Export Laws") to assure that neither the Software or any direct product thereof are (1) exported, directly or indirectly, in violation of Export Laws; or (2) are intended to be used for any purpose prohibited by the Export Laws, including, without limitation, nuclear, chemical or biological weapons proliferation.

**Exposure Assessment Report; Indemnification:** Licensor may use Customer's data to create Licensor's Exposure Assessment report ("Exposure Assessment Report") and to evaluate the performance of the Software. The Exposure Assessment is intended to provide overall visibility into Customer's network activity; it is not intended to be used as a vehicle to take action against specific individuals. Consequently, if any action is taken against individuals, Customer will license the Software at then current list price. Customer is solely responsible for taking appropriate action if illegal activities are found. Customer shall indemnify and defend Licensor from claims, costs, fees, damages, liabilities and expenses (including reasonable attorneys' fees) resulting from third-party claims based on actions taken by Customer in connection with the Exposure Assessment. Vericept must have access to the hardware for creation of the Exposure Assessment Report. Representatives of the Customer at the director level or above from Human Resources, Legal and Audit/Compliance shall be in attendance for Vericept's Presentation of the Exposure Assessment Report.

**Intellectual Property Indemnification.** Licensor shall, at its own expense, indemnify, defend and hold Customer harmless from and against any and all claims, costs, fees, damages, liabilities and expenses (including attorneys' fees) arising from any third-party claim, action, suit or proceeding to the extent based upon a claim that the Software infringes any U.S. patents or U.S. copyrights or misappropriates any trade secrets of a third party. If the Software becomes, or in the Licensor's opinion is likely to become, the subject of an infringement claim, Licensor may, at its option and expense, either (a) procure for Customer the right to continue using the Software, (b) replace or modify the Software so that it becomes non-infringing, or (c) accept return of the Software and terminate this Agreement upon written notice to Customer.

**Entire Agreement:** Except where specifically stated otherwise herein, this Agreement constitutes the complete agreement between the parties and supersedes all prior or contemporaneous agreements or representations, written or oral, concerning the subject matter of this Agreement. This Agreement may not be modified or amended except in a writing signed by a duly authorized representative of each party. This Agreement shall also supersede all terms of any unsigned, 'shrink wrap' or 'click through' license included in any package, media or electronic version of Software provided under this Agreement.

EXECUTED BY: VERICEPT CORPORATION
Signature: _____
Name: CONNOR _____
Title: CFO
Date: November 30, 2004

EXECUTED BY: CUSTOMER
Signature: _____
Name: Chuck Shinnay
Title: VP Infr + Security
Date: 11-30-04

APPROVED BY LEGAL
_____

Proprietary and Confidential
Vericept Corporation
Exposure Assessment Agreement
Page 1

**Exhibit A**
**(Description of Software)**

**VERICEPT SOFTWARE AND HARDWARE DELIVERED TO CUSTOMER**

ESTIMATED INSTALLATION DATE: _____

| Software | Products | (Qty) |
|---|---|---|
| All Categories and Products | | 1000 |

| Hardware | Products | Quantity |
|---|---|---|
| Dell PowerEdge 1750 | | 1 |

| | |
|---|---|
| Name: | Chuck Shmayed |
| Organization: | SIRVA |
| Address 1: City, State, Zip: | 700 Oaknoll Lane |
| Address 2: | |
| City: | Westport |
| State: | IL |
| Zip: | 60559 |
| Email Address (for license file): | Chuck.Shmayed@SIRVA.com |

APPROVED BY LEGAL
_[signature]_
11/30/04

11/30/2004 11:39 FAX                                                                          ☒004/004

### Exhibit B
### MUTUAL NON-DISCLOSURE AGREEMENT

This MUTUAL NON-DISCLOSURE AGREEMENT (this "Agreement") is entered into between Vericept Corporation ("Vericept") and North American Van Lines, Inc. / Sirva Inc. ("Customer") as of _____, 2004 (the "Effective Date"), to protect the confidentiality of certain confidential information of Vericept or of Customer to be disclosed under this Agreement solely for use in evaluating or pursuing a business relationship between the parties (the "Permitted Use"). Vericept and Customer may be referred to herein individually as a "Party" and collectively as the "Parties".

As used herein, the "Confidential Information" of a Party shall mean, subject to Section 2, any and all information disclosed by such Party (the "Disclosing Party") to the other Party (the "Receiving Party"), which may include without limitation: (a) patent and patent applications, (b) trade secrets, and (c) proprietary and confidential information, ideas, media, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, apparatuses, equipment, algorithms, software programs, software source documents, and formulas related to the current, future, and proposed products and services of each of the Parties, such as information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, sales and merchandising, marketing plans and information.

The Confidential Information shall be embodied in tangible material such as documents, drawings, pictures, graphics, software, hardware, tapes, charts, or disks). If the Confidential Information is disclosed orally or visually, it shall be identified as such at the time of disclosure.

Subject to Section 4, each Party agrees that at all times and notwithstanding any termination or expiration of this Agreement it will hold in strict confidence and not disclose to any third party any Confidential Information of the other Party, except as approved in writing by the other Party, and will use the Confidential Information of the other Party for no purpose other the Permitted Use. Each Party shall only permit access to Confidential Information of the other Party to those of its employees or authorized representatives having a need to know and who have signed confidentiality agreements or are otherwise bound by confidentiality obligations at least as restrictive as those contained herein.

A Receiving Party shall not have any obligations under this Agreement with respect to a specific portion of the Confidential Information of the Disclosing Party if such Receiving Party can demonstrate with competent evidence that such Confidential Information:

(a) was in the public domain at the time it was disclosed to the Receiving Party;

(b) entered the public domain subsequent to the time it was disclosed to the Receiving Party, through no fault of the Receiving Party;

(c) was in the Receiving Party's possession free of any obligation of confidence at the time it was disclosed to Receiving Party;

(d) was rightfully communicated to the Receiving Party free of any obligation of confidence subsequent to the time it was disclosed to the Receiving Party; or

(e) was developed by employees or agents of the Receiving Party independently of and without reference to any information communicated to the Recipient by the other Party; or

(f) was communicated by the Disclosing Party to an unaffiliated third party free of any obligation of confidence.

Notwithstanding the above, a Receiving Party may disclose certain Confidential Information of the Disclosing Party, without violating the obligations of this Agreement, to the extent the disclosure is required by a valid order of a court or other governmental body having jurisdiction, provided that the Receiving Party provides the Disclosing Party with reasonable prior written notice of such disclosure and makes a reasonable effort to obtain, or to assist the Disclosing Party in obtaining, a protective order preventing or limiting the disclosure.

6. The Receiving Party shall immediately notify the Disclosing Party upon discovery of any loss or unauthorized disclosure of the Confidential Information of the Disclosing Party.

7. Upon termination or expiration of the Agreement, or upon written request of the other Party, each Party shall promptly return to the other or destroy all documents and other tangible materials representing the other Party's Confidential Information and all copies thereof.

8. Each Party acknowledges that nothing contained in this Agreement shall be construed as granting any property rights, by license or otherwise, to any Confidential Information of the other Party, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on such Confidential Information.

9. Neither Party shall reproduce the Confidential Information of the other Party in any form except as required to accomplish the intent of this Agreement. Any reproduction by a Party of any Confidential Information of the other Party shall remain the property of the Disclosing Party and shall contain any and all confidential or proprietary notices or legends which appear on the original, unless otherwise authorized in writing by the other Party.

10. This Agreement shall terminate three years after the Effective Date, or may be terminated by either Party at any time upon 30 days written notice to the other Party. Each Party's obligations under this Agreement shall survive termination of the Agreement and shall be binding upon such Party's heirs, successors and assigns. Each Party's obligations hereunder shall continue in full force and effect for five years from the date of disclosure of such Confidential Information.

11. This Agreement shall be governed by and construed in accordance with the laws of Delaware without reference to conflict of laws principles. Any disputes under this Agreement may be brought in the state courts and the Federal courts located in the county containing the address of the non-filing party as set forth in the Exposure Assessment Agreement, and the Parties hereby consent to the personal jurisdiction and venue of these courts. This Agreement may not be amended except by a writing signed by both Parties hereto.

12. Each Party acknowledges that its breach of the Agreement may cause irreparable damage to the other Party and hereby agrees that the other Party shall be entitled to seek injunctive relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction.

13. If any provision of this Agreement is found by a proper authority to be unenforceable or invalid such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole and in such event, such provision shall be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or applicable court decisions.

14. Neither Party shall communicate any information to the other in violation of the proprietary rights of any third party.

15. Neither Party shall assign or transfer any rights or obligations under this Agreement without the prior written consent of the other Party, provided that a Party may assign the Agreement without such consent to its successor in interest by way of merger, acquisition or sale of all or substantially all of its assets.

16. Neither Party shall export, directly or indirectly, any technical data acquired from the other pursuant to this Agreement or any product utilizing any such data to any country for which the U.S. Government or any agency thereof at the time of export requires an export license or other governmental approval without first obtaining such license or approval.

17. All notices or reports permitted or required under this Agreement shall be in writing and shall be delivered by personal delivery, or by certified or registered mail, return receipt requested, and shall be deemed given upon personal delivery or five days after deposit in the mail. Notices shall be sent to the addresses set forth at the end of this Agreement (attn: Legal Department) or such other address as either Party may specify in writing.

18. Neither Party shall modify, reverse engineer, decompile, create other works from, or disassemble any software programs contained in the Confidential Information of the other Party without the prior written consent of the other Party.

NOV 30 2004 11:27AM SIRVA HARRIS                630-458-4728                                  p.4

# EXHIBIT B



VERICEPT Proposal

Perpetual License/Appliance

| Account Name: | | | | | |
|---|---|---|---|---|---|
| Attn: | | | | | |
| | chuck.shmavel@sirva.com | | | | |
| Phone #: | 630-468-4763 | | | | |

| Vendor: | | | Date: | 8-Dec-04 |
|---|---|---|---|---|
| Vericept Corporation | | | | |
| 750 West Hampden Ave., Suite 550 | | | | |
| Englewood, CO 80110-2163 | | | | |
| Fax: 303-268-0515 or 303-268-0520 | | | | |
| Phone Number: 303-798-1568 | | | | |

TERMS: Payments are due Net 30 from invoice date.

### Vericept Appliance pricing for ~7,000 workstations

| | Product # | Appliances | List Price | Savings | Purchase Price |
|---|---|---|---|---|---|
| Software | | | | | |
| Vericept Risk Management Appliance | VAPPL | 1 | $81,307 | $0 | $81,307 |
| Includes the following Software Components: | | | | | |
| RISK MANAGEMENT SOLUTION: Information Privacy and Compliance Manager, Acceptable Use Manager, Preventative Security Manager, Custom Search Parameters | VRMB | | | | |
| STORED DATA ANALYZER | VSDA | | | | |
| **Vericept Risk Management Appliance** | | 8 | $81,307 | $0 | $650,456 |
| **Total Software & Hardware** | | | | | **$650,456** |
| Professional Services | | Quantity | Price | | Total |
| Vericept Implementation and Training Services Package | | 3 Days | $8,775 | | $8,775 |
| **Total Professional Services** | | | | | **$8,775** |
| **TOTAL FOR Vericept SOLUTION** | | | | | **$659,231** |

| Maintenance: | First year included. Subsequent years calculated at 20% of purchase price for additional years. |
|---|---|

The use of any Vericept Software constitutes acceptance of the terms and conditions of the Software License Agreement and Limited Warranty for Hardware that are provided with that Software. Read those documents prior to installation. Terms: Net 30

**Professional Services**

The Implementation and Training Services Package includes three (3) days of on-site implementation and training at a single location.
Implementation consists of the installation of the operating system and application, and establishing communication within the network. It includes multiple devices (maximum 6) at that location. Additional locations are priced at $1,700 per location.
Training is provided for up to five (5) administrators of the Vericept system responsible for deployment, continual administration, and data management and review. Classes include:
• Deployment Training for System Administrators covering network installation and system installation onto console and engines at one location
• Vericept Administrator Training for managers of the Vericept system
• Implementation & Training Services on a per day basis (alternative option to the inclusive package; does not include travel & expenses)
• Post-implementation Consultation
• Network Configuration Consultation

Pricing is valid until 12/31/04